IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

RECONSTRUCTION EXPERTS, INC.

     Plaintiff,

v.

GEMINI INSURANCE COMPANY

     Defendant.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Reconstruction Experts, Inc., through counsel, Otteson Shapiro LLP, hereby submits its Complaint against Gemini Insurance Company and alleges as follows:

### <u>PARTIES, JURISDICTION, AND VENUE</u>

1.    Plaintiff Reconstruction Experts, Inc. ("RE") is a Colorado corporation with its principal place of business in Colorado.

2.    Upon information and belief, Defendant Gemini Insurance Company is a Delaware corporation with its principal place of business in Arizona, which is consistent with the jurisdictional allegations in a Complaint Gemini Insurance Company filed against RE regarding a different claim (3:21-cv-00099-E, currently pending in the United States District Court for the Northern District of Texas).

3.      The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because RE, the Plaintiff, and Gemini Insurance Company, the Defendant, are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interest and costs.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

## BACKGROUND FACTS

*RE's CGL Policy with Gemini*

5.      RE is a construction company that engages in work in Colorado and other states.

6.      Gemini Insurance Company is a subsidiary of W.R. Berkeley Corporation.

7.      Gemini Insurance Company provided commercial general liability insurance to RE under CGL policy number VGGP005420 with a policy period of November 1, 2020 – November 1, 2021 with limits of $1M per occurrence and $2M aggregate ("Policy").

8.      Pursuant to the Policy, Gemini Insurance Company is obligated to adjust claims made under the Policy, which it delegated to its claims handling agent, Vela Insurance Services, LLC ("Vela" or collectively with Gemini Insurance Company "Gemini"), which is also a subsidiary of W.R. Berkeley Corporation.

9.      The Policy is subject to a $50,000.00 SIR that may be exhausted by payment of damages and "defense expenses." *See* VE 05 27 06 15.

10.     The Policy provides coverage for those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which the insurance applies. *See* Section I – Coverages, Coverage A, 1.a., CG00011207, page 1 of 16.

***The December 21, 2020 Loss, and RE's Emergency Mitigation Efforts***

11.     In December 2020, RE was engaged in construction work at the Wedgwood at the Strand residential condominium complex in Naples, Florida ("Project").

12.     The Project is controlled by a Homeowners Association ("HOA").

13.     RE employed a temporary roof protection system at the Project to ensure that the Project's roof was watertight during non-working hours.

14.     During the early hours of December 21, 2020, a severe rainstorm occurred at the Project.

15.     RE was not present at the Project during the rainstorm.

16.     RE was alerted to water intrusion at the Project by the Project's HOA President around approximately 4 a.m.

17.     RE immediately reported to the Project and observed pervasive water intrusion through the wall cavities and into unit owners' residences from the rainstorm.

18.     The water intrusion was caused by the failure of RE's temporary roof protection system.

19.     The December 21, 2020, failure of RE's temporary roof protection system caused water intrusion into numerous condominium units at the Project, which caused resulting property damage and loss of use ("Loss").

20.      Upon arrival at the Project, RE undertook emergency mitigation efforts to stop the water intrusion to reduce resulting property damage, including loss of use.

21.     RE made emergency repairs to the temporary roof protection system to avoid further water intrusion.

22.     Commencing in the morning of December 21, 2020, and continuing thereafter, RE undertook emergency dry-out efforts to mitigate resulting property damage.

23.     RE retained Fireservice for emergency dry-out efforts.

24.     Fireservice agreed to accept approximately $140,000.00 for its services, which was the final amount paid after RE negotiated a reduction in Fireservice's original invoices.

25.     Most of Fireservice's services were performed on or before December 24, 2020.

26.     RE's SIR was satisfied by its payment of Fireservice's invoice.

27.     The Loss also displaced several unit owners when the Loss rendered their residences unfit for habitation.

28.     RE paid for emergency housing for the displaced unit owners, including at one or more nearby hotels.

29.     Once the damaged units were fit for habitation, emergency housing was no longer needed and the displaced unit owners were able to return to their residences.

30.     RE undertook such emergency mitigation efforts because of "property damage" and are within the broad grant of coverage under the Policy.

31.     Without RE's emergency mitigation efforts commencing in the morning of December 21, 2020, there would have been significant additional resulting property damage.

32.     RE's emergency mitigation efforts as to the affected areas of the Property mitigated RE's potential liability to the HOA and, in turn, Gemini's potential liability under the Policy.

***The Claim and Events Thereafter***

33.     On December 22, 2020, RE reported the Loss to Gemini and Gemini, via RE's broker Ironwood Insurance ("Ironwood"), as directed in the Policy.

34.     On December 24, 2020, Gemini acknowledged the Loss and RE's claim via a letter from Don Asselin.

35.     RE's claim at the Project was assigned claim number V000000130856 by Gemini (the "Claim").

36.     Gemini's December 24, 2020, letter misstated RE's SIR as $100,000.00, rather than $50,000.00.

37.     Don Asselin's December 24, 2020, transmission email stated that "Ann Jenkins will be handling this matter but is currently out of the office this week" and requested that RE provide certain documents to Gemini.

38.     No further response, instructions, or affirmative action was taken by Gemini in 2020 as to the Claim.

39.     On January 5, 2021, Ms. Jenkins confirmed that RE's SIR was only $50,000.00.

40.     Thereafter, Ms. Jenkins, the adjuster assigned to the Claim by Gemini, did not contact RE to discuss the Loss, the Claim, necessary emergency mitigation efforts, repairs, or relocation expenses.

41.     After the initial dry-out, while awaiting Gemini to take any affirmative action on the Claim, RE walked the Property with the president of the HOA.

42.     The president of the HOA, each individual unit owner, and RE identified the damage caused by the Loss and the scope of necessary repairs.

43.     The HOA and individual unit owners demanded that RE repair the damage caused by the Loss.

44.     RE created an Xactimate estimate for each unit at the Project, detailing the scope and cost of repairs.

45.     Once RE created the Xactimate estimates, then RE began hiring subcontractors to begin repair work.

46.     RE obtained quotes or estimates from potential subcontractors for the necessary repair work.

47.     Prior to agreeing to hire any subcontractor, RE's employees compared the subcontractors' quotes/estimates to RE's Xactimate.

48.     RE negotiated down several subcontractors' quotes/estimates to be in line with RE's Xactimate.

49.     On January 28, 2021, RE sent all documents requested in Gemini's December 24, 2020, letter via an email from RE's general counsel to Gemini via Mr. Asselin and Ms. Jenkins, including a summary of reasonable expenses incurred to date ($279,524.13).

50.     On January 28, 2021, RE also advised Gemini of the settlement demand in the amount of $105,926.66 received from one of the unit owners, Donato.

51.     On February 1, 2021, RE requested to set a call on February 2 or 3, 2021, to discuss with Gemini reconciliation of the SIR and reimbursement because RE's expenses had far exceeded its SIR.

52.     On February 4, 2021, Mr. Asselin responded via email, "Thanks for sending over. So Reconstruction Experts has paid out of their own pocket $308,872.13 to date?"

53.     Within minutes, RE confirmed via email, stating "That is correct, and counting.  Invoices continue to come in daily."

54.     RE received no substantive response from Gemini.

55.     On February 7, 2021, RE requested direction from Gemini on how to settle the Donato claim, provided an updated summary of reasonable expenses incurred to date ($376,510.97), requested from Gemini direction on how to handle invoices that continue to come in, and requested direction for obtaining reimbursement for expenses beyond the SIR.

56.     Gemini did not provide direction to RE as to repair work or settlement of unit owners' demands , and failed to acknowledge RE's satisfaction of the SIR.

57.     In response to intervention by Ironwood, Gemini set a video-conference call for February 12, 2021.

58.     The February 12, 2021, call was 53 days after the date of the Loss.

59.     The February 12, 2021, call was Gemini's first meaningful discussion of the Claim with RE.

60.     As of the time of the February 12, 2021, call, RE reasonably incurred in excess of $412,908.82 in hard costs for repair work, relocation, settlements, and other damages.

61.     The February 12, 2021, call was attended by manager Mr. Asselin, claims adjuster Ms. Jenkins, Tami York, Esq. of RE, and Lee Shaw of Ironwood.

62.     During that call, RE was advised by Gemini that Gemini had assigned the wrong adjuster to the Claim, and that the Claim would be re-assigned to a replacement adjuster, one with experience with water loss claims.

63.     Gemini did not have the replacement adjuster participate in the February 12, 2021, call.

64.     Mr. Asselin, on behalf of Gemini, acknowledged on the call that Gemini had not properly or timely handled the Claim.

65.     Mr. Asselin, on behalf of Gemini, assured RE and Ironwood that Gemini would promptly reconcile the SIR and issue reimbursement to RE.

66.     Gemini's representations regarding its intent to reconcile the SIR and issue reimbursement were not conditioned on the occurrence of any additional actions by RE.

67.     At the time that Gemini made these representations to RE, Gemini was aware of covenants of the Policy, including Gemini's consent to payments and settlements.

68.     At the time that Gemini made these representations to RE, Gemini was aware that RE had been performing repair work necessitated by the Loss and settling unit owners' demands related to the Loss.

69.     Gemini did not instruct RE to cease the repair work at the Project or to cease settling claims.

70.     Gemini did not give direction for settlement of the unit owners' demands, including the Donato demand.

71.     Gemini did not request or provide a means for Gemini to assume management of the repairs, settlements, and Claim.

72.     Gemini, by its actions and inactions, waived any applicable Policy covenants regarding the Loss and Claim, including the duty of cooperation, voluntary payments, and consent to settlement.

73.     Gemini assigned Nicole Fagan as the new adjuster on the Claim.

74.     On February 12, 2201, RE and Ms. Fagan discussed the status and magnitude of the Claim via telephone.

75.     During the February 12, 2021, call, Ms. Fagan indicated to RE that the Claim is "not how these types of claims are normally handled" and that she did not know why it has taken so long for Gemini to respond.

76.     Despite Gemini's assurances and the assignment of a new adjuster, the Claim continued to languish.

77.     Between February 1 and 18, 2021, RE provided numerous updates to Gemini regarding the Donato settlement demand.

78.     On February 18, 2021, Gemini's adjuster requested an update on the status of the Donato settlement negotiations and requested certain documents related to that claim.

79.     Throughout these conversations, Gemini did not object to RE engaging in settlement negotiations nor did Gemini provide alternative instructions for responding to HOA and unit owner demands (including Donato), settlement of claims, and releases.

80.     On February 18, 2021, Ms. Fagan stated via email to RE that Gemini "cannot make any commitment at this time re: any reimbursement as full analysis needs to be made of all submitted documentation."

81.     RE protested that two months after the Loss RE was still carrying over $535,000.00 in hard cost damages alone, despite having satisfied its $50,000.00 SIR.

82.     Gemini refused to provide a timeline for SIR reconciliation and reimbursement because Gemini "needs time" to review all documentation and conduct a coverage investigation.

83.     The next day, on February 19, 2021, Gemini issued its first purported Reservation of Rights letter.

84.     On or around February 19, 2021, Gemini assigned an independent investigator, Chris Hudson, to the Claim.

85.     RE promptly provided Mr. Hudson with all requested documents in numerous formats, and provided access to RE's employees to assist with Mr. Hudson's investigation.

86.     Gemini and Mr. Hudson were advised that RE had prepared Xactimate estimates for the repair work that was necessitated by the Loss, which had commenced at the Project.

87.     The Xactimates showed the scope and cost of work to be performed by the subcontractors.

88.     On or around February 24, 2021, at the request of Mr. Hudson, RE provided RE's Xactimates to Mr. Hudson.

89.     On February 24, 2021, Mr. Hudson confirmed via email, "We were able to download the estimates and photographs.  They appear to be well written and inline."

90.     Neither Mr. Hudson nor Gemini objected to the Xactimates or instructed RE to cease repair work.

91.     On February 25, 2021, Mr. Hudson's associate came to inspect the Project, during ongoing repairs. Mr. Hudson did not attend the inspection.

92.      While Mr. Hudson requested to view all impacted units, his associate chose to view only a few units before leaving the Property that same day.

93.     Presumably, Mr. Hudson's associate obtained all information necessary to approve the cost of repairs submitted by RE based on his limited investigation.

94.     On March 15, 2021, RE provided Gemini with an update on hard cost expenses and again requested a timeline for Gemini's SIR reconciliation for purposes of reimbursement.

95.     Ms. Fagan responded that Gemini must be able to evaluate all presented damages as if this were a third-party claim submitted for consideration.

96.     Gemini continued to refuse to commit to a timeline for SIR reconciliation and reimbursement.

97.     To this point, Gemini had not objected to the repair work or RE's settlement of unit owner claims, nor instruct RE to stop these actions.

98.     RE was compelled to continue its repair work and to effect settlements, and then present its entire damages claim to Gemini, as it instructed.

99.     On March 23, 2021, over three months after the Claim was first tendered, Gemini for the first time requested copies of written demands from each unit owner.

100.    On March 30, 2021, Gemini sent RE a bill for $5,446.60 for services performed by Mr. Hudson, noting that this amount would go towards satisfying RE's SIR.

101.    RE's SIR had been satisfied within days of the Claim, so Gemini's request demonstrates that Gemini still had not reconciled RE's SIR as of March 30, 2021.

102.    On March 31, 2021, Gemini acknowledged that Mr. Hudson's bill was sent to RE in error and that Gemini would pay the invoice, but did not address reimbursement for the amounts RE spent above its SIR.

103.    On April 14, 2021, RE forwarded to Gemini an updated loss statement and noted that RE was "expecting Ms. [Erika] Collazo in Unit 2006, who has retained an attorney, to make additional demands."

104.    On April 16, 2021, RE forwarded to Gemini the relocation expense demand from the attorney of a unit owner, Ms. Collazo.

105.    In her April 16, 2021, email to Gemini, RE's General Counsel addressed the Collazo demand and stated, "I am in the process of reviewing these invoices, but as I mentioned, I believe them to be excessive and will be attempting to reach a resolution with [Ms. Collazo's] attorney."

106.    Gemini did not object to or give feedback regarding the course of action proposed for the Collazo demand.

107.    Gemini took no action to negotiate the Collazo demand, defend RE, nor to provide a form release.

108.    RE provided Gemini with an updated damages/expense summary, now totaling $728,966.81.

109.    On April 28, 2021, Gemini notified RE for the first time that Gemini needed releases from each unit owner for whom RE had already completed repair work.

110.    Improperly pressured by its insurer, which had unreasonably refused to manage the Claim, and facing economic hardship from carrying $730,000.00 on this Claim, RE agreed to indemnify Gemini in the event of a claim that arises for RE's repair work because of lack of a release from a unit owner.  RE did so based on the understanding that resolution of this Claim and reimbursement would be immediately forthcoming if RE entered into an indemnity agreement with Gemini.

111.    On May 12, 2021, Gemini advised RE via letter that Gemini needed to have the totality of the damages claim for the Project "… before we [have] any discussion.  We need to have a full understanding of the totality of what you are presenting."

112.    Gemini's May 12, 2021, letter did not object to RE's ongoing repair work or settlement of claims stemming from the Loss.

113.    On May 20, 2021, RE provided Gemini with an updated loss statement of $738,805.29.

114.    Throughout 2021, Gemini unreasonably asked its insured to take actions not required by the Policy, including, but not limited to: repeatedly submit the same invoices in different locations and formats; retroactively obtain inordinately detailed invoices from subcontractors; obtain written demands from individual unit owners; obtain releases of claims from individual unit owners; and, to agree to indemnify Gemini against any claims made by the HOA and any individual unit owner, occupants or residents against Gemini.

115.    Gemini repeatedly encouraged its insured to continue to incur costs through repair work and settlements, and to submit invoices after the fact.

116.    Gemini represented to RE that RE's Claim was being handled as a third-party claim.

117.    At no point was RE advised that Gemini considered RE's mitigation and repair work and RE's settlements as being effected without Gemini's consent.

118.    To the contrary, RE was told that the SIR would not be reconciled, and the Claim would not be adjusted, until everything was complete and all invoices were submitted.

119.     On May 20, 2021, RE submitted what it believe were all invoices and a final summary of expenses, and requested from Gemini the timing of its review of the Claim.

120.     On June 16, 2021, almost six months after the Loss, Gemini issued its dilatory and unreasonable coverage position letter, which wrongfully denied coverage for the Claim on the basis of RE's alleged failure to comply with Policy condition 2.d.

121.     Policy condition 2.d. provides in relevant part:

> **2.     Duties In The Event Of Occurrence, Offense, Claim Or Suit**
>
> * * *
>
> d.     No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

122.     The June 16, 2021, denial letter states, in part, that Gemini refused to cover RE on the basis that RE "assumed responsibility for damage to various tenants' property and the cost of repairing same without Gemini's consent," purportedly in violation of Policy condition 2.d.

123.     Even if condition 2.d. applied to the Claim, Gemini waived the right to rely on it to bar or limit coverage, and forfeited the right to rely on it because Gemini had materially breached the Policy by failing to reasonably adjust the Claim.

124.     Gemini's letter of June 16, 2021, did not provide an SIR reconciliation nor an analysis of any specific amounts of the Claim it contends are overstated.

125.     Gemini also unreasonably denied that RE is entitled to overhead and profit amounts for RE's coordination of the necessary repair work.

126.     Due to Gemini's actions and inactions on the Claim, RE was left to its own devices to manage and direct the repair work and effect settlements.

127.    Unknown to RE, during the course of the adjustment, Gemini acted to benefit its own interests ahead of and to the detriment of the interests of RE.

128.    RE's damages exceed $700,000.00, excluding treble damages, attorney's fees and costs, and interest to which RE may be entitled.

**Gemini's Pattern of Conduct with RE**

129.    The Policy is not the only insurance policy that RE has with Gemini.

130.    RE has made claims under other Gemini insurance policies with Vela acting as the claims adjuster on Gemini's behalf.

131.    On all claims for coverage tendered by RE, Gemini has adopted a policy of refusing to engage in the resolution of RE's claims in a timely and proper manner.

132.    On all claims tendered by RE, Gemini opts to have its insured expend funds in excess of the SIR, dispute satisfaction of the SIR, and then later attempt to deny or settle the claim with the insured for less than the full benefits owed under the policy.

133.    In the several years that RE has had policies issued by Gemini and adjusted by Vela, Gemini has never paid a single claim to RE.

134.    In the several years that RE has had policies issued by Gemini and adjusted by Vela, Gemini has forced RE to engage coverage counsel and in coverage litigation in several cases.

135.    Gemini's failure to acknowledge satisfaction of an insured's SIR is, upon information and belief, a habitual pattern and practice of misconduct by Gemini.

136.    Gemini's improper investigation and settlement practices are designed to extract concessions from its insureds, including forcing its insureds to finance necessary repair work and contribute the insured's own funds to settle covered claims.

137.    It is Gemini's business practice to engage in such inappropriate conduct towards its insureds, at least with respect to claims made under its comprehensive general liability insurance policies.

138.    Gemini's business practice constitutes deceptive trade practices in violation of C.R.S. § 6-1-105.

139.    Gemini's deceptive trade practices occurred in the course of its business.

140.    Gemini's deceptive trade practices significantly impact the public as actual or potential consumers of Gemini's insurance products and services.

141.    Gemini concealed and failed to disclose to RE its business practice of engaging in such deceptive trade practices.

142.    Gemini failed to disclose its practice of engaging in such deceptive trade practices with the intent to induce RE into purchasing the Policy.

143.    Gemini's deceptive trade practices have injured RE and have caused it to sustain damages.

144.    RE's claims herein are timely filed.

145.    All conditions precedent to RE's claims herein, if any, are satisfied or excused.

## FIRST CLAIM FOR RELIEF
### Breach of Contract – Gemini

146.    RE incorporates by reference the allegations in paragraphs 1 to 145 as if fully stated herein.

147.    Gemini was obligated to adjust the Claim in a reasonable and timely manner.

148.    Gemini was obligated to protect RE and defend against and settle claims asserted against RE, including those by the HOA and individual unit owners.

149. RE has fully performed all covenants, obligations or conditions in the Policy, or such performance has been excused or waived.

150. Gemini materially breached the Policy by, among other things:

    a.    Failing to adjust the Claim in a reasonable and timely manner.

    b.    Failing to reconcile RE's SIR.

    c.    Attempting to create unenforceable, retroactive conditions to recovery of covered benefits under the Policy.

    d.    Relying on conditions of the Policy for which performance was excused, waived, or are not material.

151. As a result of Gemini's breach of contract, RE has been damaged in amounts to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Common Law Bad Faith – Gemini

152. RE incorporates by reference the allegations in paragraphs 1 to 151 as if fully stated herein.

153. RE's expenses necessarily incurred, including for emergency mitigation efforts, costs for repairs, relocation, settlements, and other damages, were because of "property damage" resulting from an "occurrence".

154. The Policy contains an implied duty of good faith and fair dealing under which Gemini agreed to treat RE fairly, honestly and in good faith; faithfully perform its duties under Policy; and do nothing to impair, interfere with, hinder, or potentially injure RE's rights to receive the benefits of the Policy.

155. Gemini had a duty to act reasonably and in good faith at all times in the handling of the Claim under the Policy and in all its dealings with RE.

156.    Gemini acted unreasonably, with reckless disregard, and breached its duty of good faith and fair dealing without a reasonable basis and without properly investigating the Claim and coverage.

157.    Gemini breached its obligations, by, among other wrongful and unreasonable conduct:

a.      Failing to timely and sufficiently adjust the Claim, which failures were admitted by Gemini in February 2021.

b.      Failing to timely and sufficiently communicate with RE regarding the Claim.

c.      Failing to reasonably investigate the property damage and loss of use.

d.      Failing to promptly compensate RE for emergency mitigation efforts that were required under the Policy.

e.      Failing to promptly reconcile RE's SIR and reimburse RE for expenses above the SIR amount.

f.      Failing to object to ongoing settlement of unit owners' demands by RE, requesting all final invoices for unit owners' demands be submitted prior to reimbursement, and then taking the position that RE was not authorized to engage in settlement of unit owners' demands.

g.      Failing to object to ongoing repair work by RE, requesting all final invoices for repair work be submitted prior to reimbursement, and then taking the position that RE was not authorized to undertake the repair work.

h.      Repeatedly encouraging RE to continue to incur costs through work and settlements and submit invoices after the fact, withholding SIR reconciliation and reimbursement until the full damages claim for all repair work was submitted, and then denying coverage.

i.      Failing to reasonably re-inspect and re-adjust when requested.

j.      Demanding that its insured take steps not required by the Policy, including, but not limited to asking RE to: repeatedly submit the same invoices in different locations and formats; repeatedly submit Xactimates in multiple formats; obtain written demands from individual unit owners; retroactively obtain inordinately detailed invoices from subcontractors; obtain releases of

claims from each unit owner; and, to agree to indemnify Gemini against any claims made by the HOA against Gemini.

k.      Attempting to create unenforceable, retroactive conditions to recovery under the Policy and impeding resolution of the Claim, including requiring that RE obtain written demands from individual unit owners and releases from the HOA and unit owners.

l.      Evaluating the Claim with the intention to deny coverage and to litigate with its insured.

m.      Unreasonably delaying or denying payment to RE.

n.      Failing to follow the advice of experts retained by Gemini.

o.      Issuing a denial letter which relied on Policy provisions that are inapplicable under the facts of this case and based on Gemini's conduct.

p.      Taking the unfounded position that the damage was not caused by RE's acts without identifying an alternate cause of the damages supported by fact or law.

q.      Taking the unfounded position that the Claim constitutes a first party insurance claim to which the Policy does not apply.

r.      Adopting unreasonable, coverage-limiting interpretations of its coverage obligations to RE's detriment.

s.      Performing acts prohibited by C.R.S. § 10-3-1104(1)(h), including, without limitation:

(I)  Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
(II) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
(III) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
(IV)  Refusing to pay claims without conducting a reasonable investigation based upon all available information;
(VII) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;
(X)  Making claims payments to insureds or beneficiaries not accompanied by statement setting forth the coverage under which the payments are being made;

(XIV)  Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

158.    Gemini knew that its conduct and positions were unreasonable and/or Gemini recklessly disregarded the fact that its conduct and positions were unreasonable.

159.    Gemini's delay and refusal to pay RE for all the damages and losses incurred has been, and continues to be, unreasonable, without basis, and with reckless disregard, and constitutes a breach of the covenant of good faith and fair dealing in the Policy in that Gemini knew it had no good cause for its failure and refusal to pay covered benefits to RE.

160.    At all times herein, Gemini placed its own interests above its insured's interests, all to RE's detriment.

161.    Gemini's actions have proximately caused damage to RE in amounts to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**Statutory Bad Faith – Gemini**

162.    RE incorporates by reference the allegations in paragraphs 1 to 161 as if fully stated herein.

163.    RE is a first party claimant under C.R.S. §§ 10-3-1115 and 10-3-1116.

164.    Gemini is engaged in the business of insurance, including with respect to the Policy.

165.    Gemini violated C.R.S. § 10-3-1115 by unreasonably delaying and denying payment of covered benefits under the Policy.

166.    Gemini unreasonably failed to communicate with RE regarding the Claim, failed to reasonably adjust the Claim, and unreasonably delayed and denied payment of covered benefits under the Policy.

167.    Gemini unreasonably denied coverage for the Loss, including emergency mitigation efforts, repair work, loss of use, and settlement of claims.

168.    Gemini unreasonably delayed and denied payment of covered benefits by acquiescing and failing to object to RE's ongoing repair and settlement of claims efforts, requiring RE to submit all final invoices as a condition precedent to reimbursement, and then denying payment thereafter.

169.    Gemini's determination of the scope and cost of repairs was unreasonable and resulted in the unreasonable delay and denial of covered benefits.

170.    Gemini failed to adjust the Claim appropriately resulting in unreasonable delay and denial of benefits owed under the Policy.

171.    Gemini unreasonably denied payment for items Gemini contended were not damaged by RE's actions, even though Gemini has no evidence of an alternate cause of the damages.

172.    Despite the opinion of its own retained expert, Gemini unreasonably denied payment for the damages reasonably incurred as a result of the Loss.

173.    Gemini unreasonably denied payments based on language in the Policy which Gemini knew was inapplicable or which it misrepresented.

174.    Pursuant to C.R.S. § 10-3-1116, RE is entitled to compensatory damages including the covered benefits, plus twice the covered benefits, plus attorney fees and costs.

WHEREFORE, Plaintiff Reconstruction Experts, Inc. prays for relief as follows:

A.      For judgment in its favor awarding actual, compensatory, consequential and statutory damages;

B.      For expert fees and costs of suit;

C.      For attorney fees;

D.      For all relief available under C.R.S. § 10-3-1116;

E.      For pre-judgment and post-judgment interest;

F.      And for such other and further relief as appears just and proper.


**PLAINTIFF RECONSTRUCTION EXPERTS, INC. DEMANDS A JURY TRIAL ON ALL ISSUES AND ON ALL CLAIMS.**

DATED this 23rd day of July, 2021.

                                        Respectfully submitted,


                        By:      /s/  Stephen B. Shapiro
                                 Stephen B. Shapiro
                                 Alexis A. Reller
                                 **OTTESON SHAPIRO LLP**
                                 7979 E. Tufts Avenue, Suite 1600
                                 Denver, CO 80237
                                 (720) 488-0220

                                 ATTORNEYS FOR PLAINTIFF
                                 RECONSTRUCTION EXPERTS, INC.


00684147.DOCX